## MARSDEN J. PERRY, Respondent, v. COUNCIL BLUFFS CITY WATER–WORKS COMPANY, Appellant.

*Implied authority of the financial manager of a corporation — liability of the corporation on notes made by him — limit of recovery on the notes.*

Where the treasurer of a business corporation is also permitted to become and act as its sole financial manager, the corporation will be chargeable, irrespective of the question of authority, in fact, with liability for acts done by him within the apparent scope of the authority conferred upon him by the corporation.

The treasurer of a water-works company had been permitted, through the omission of its other officers to direct its financial management or supervise his acts, to become and act as its sole financial manager, and had made and negotiated some fifty promissory notes in its name, during a period extending over about a year and a half:

*Held*, that the company was liable to a *bona fide* holder for value of a promissory note executed in its name by such treasurer, which matured while he was still treasurer, and the proceeds of which, so far as received by him, had been applied to the use of the corporation, although the note was not specially authorized.

One who has loaned money upon the security of a promissory note, not valid as a legal obligation against the maker in the hands of the prior holders, but which when transferred to him became in his hands a legal obligation, is limited in his recovery thereon against the maker to the amount loaned by him, with legal interest from the date of his loan.

Appeal by the defendant, the Council Bluffs City Water-works Company, from a judgment of the Supreme Court, in favor of the plaintiff for $7,350.03, damages and costs, entered in the office of the clerk of the city and county of New York on the 29th day of January, 1891, upon the decision of a referee.*

---

* The opinion of the referee (George Putnam Smith, Esq.), referred to in the opinion at General Term, was as follows:

This action is brought upon a promissory note, which reads as follows:

"$5,000.                                                    New York, *Nov.* 23d, 1886.

" Four months after date we promise to pay to the order of Allen & Stead five thousand dollars at the treasurer's office, 44 Broadway, New York.

" Value received.
                    " COUNCIL BLUFFS CITY WATER–WORKS CO.,
                                        " Henry Allen, *Treasurer.*"

It was indorsed by Allen & Stead and sent by Allen to one Bradford, a person in Providence, Rhode Island, who claimed to have facilities for obtaining the discount of mercantile paper. Bradford took the note in December, 1886, to plaintiff at Providence, Rhode Island, and asked for a loan upon it. Plaintiff, remember-

*James L. Bishop,* for the appellant.

*George B. Ashley,* for the respondent.

O'Brien, J.:

As stated by the referee in his opinion, this action is brought upon a promissory note, which reads as follows:

"$5,000.                                    New York, *Nov.* 23d, 1886.

"Four months after date we promise to pay to the order of Allen & Stead five thousand dollars at the treasurer's office, 44 Broadway, New York.   Value received.

"COUNCIL BLUFFS CITY WATER–WORKS CO.,
"Henry Allen, *Treasurer.*"

It was indorsed by Allen & Stead and sent by Allen to one Bradford, a person in Providence, Rhode Island, who claimed to have facilities for obtaining the discount of mercantile paper.   Bradford took the note in December, 1886, to plaintiff at Providence, Rhode Island, and asked for a loan upon it.   Plaintiff, remembering that a bank, wherein he was a director, had discounted such a note for Bradford, got that note from the cashier and compared it with the one in suit and found them similar in form, and the president of that bank also told him there was another such note held by a savings bank in Providence, and that it was a good loan.   Plaintiff, therefore, lent to Bradford $4,500 on the note, and he sent $2,500 to Allen, the maker, who entered the fact of the issue of the note

ing that a bank, wherein he was a director, had discounted such a note for Bradford, got that note from the cashier and compared it with the one in suit and found them similar in form; and the president of that bank also told him there was another such note held by a savings bank in Providence, and that it was a good loan.   Plaintiff, therefore, lent to Bradford $4,500 on the note, and he sent $2,500 to Allen, the maker, who entered the fact of the issue of the note and the receipt of the money on the books of Allen & Stead, in an account therein kept as the Council Bluffs Water-works account, and he testified that he applied the proceeds to that company's use.

The defendant claims that this cause is *res adjudicata,* and is controlled by the decision of the General Term of this court (second department) in the cause of *First National Bank of Middletown* v. *Council Bluffs City Water-works Company*

and the receipt of the money on the books of Allen & Stead .in an account therein kept as the Council Bluffs Water-works account, and he testified that he applied the proceeds to that company's use.

The questions presented for review are, whether the defendant corporation is liable upon the note, and, if liable, to what extent?

Upon the former, as to defendant's liability, we might content ourselves with resting the case upon the reasonings contained in the

---

(56 Hun, 412), and if this is not so, that, upon the merits, this note is not a valid and binding obligation of the company.

The Middletown Bank sued upon a note purporting to be that of the defendant. The testimony in that case was to the effect that on February 26, 1887, Allen made three notes in the same form as those in the case at bar, all due in four months from their respective dates, and amounting, in the aggregate, to $12,500, and these were delivered to one Van Steenburgh February 28, 1887, upon an agreement that he should give in exchange therefor $4,600 in cash and $8,500 in bonds of a certain gas company. No time was fixed for the payment by Van Steenburgh, and it seems to have been conditioned upon getting the notes discounted. He, however, on February twenty-sixth, gave Allen two gas bonds for $500 each, which Allen said he needed to borrow money on for the company.

February 28, 1887, Allen was removed from the treasurership of the company, but on March twenty-ninth Van Steenburgh got the notes discounted, whereupon he paid over to Allen the $4,600 in cash and gave him the rest of the bonds, and the money and bonds so received were kept by Allen. The referee found that the board of directors never authorized Allen to make a promissory note for the company; that they never knew that he was issuing such notes, and that they never ratified his action in that respect.

The General Term, therefore, held that, whether the notes had a legal inception before February twenty-eighth, when Allen ceased to be treasurer, was " certainly very doubtful," but that if they did the decision in plaintiff's favor given by the referee rested "upon a single point" that some of the proceeds of some of the previous notes had been used by Allen to pay the debts of the company without the knowledge of the company or its officers, and that, therefore, the company became liable for Allen's acts in subsequently issuing the notes of the company and applying the proceeds to his own use. Upon an examination of the evidence bearing upon this point the court held that the referee had erred, that there was no indebtedness of the company, except its bonds, as Allen had personally assumed all its other obligations; that the prior notes were never authorized, and no part of the proceeds was ever used for the benefit of the defendant.

While the decision in the Middletown Bank case may be recognized as controlling, upon the state of facts therein presented, the evidence in the case at bar is, in some important respects, more favorable to the present plaintiff. The note here sued on was made and discounted while Allen was treasurer, and such part of its proceeds as came to his hands was received by him as such. The relation between Allen and the company was more clearly defined than in the former case,

opinion of the learned referee, which, upon the evidence, disposed of the defenses that plaintiff is not a *bona fide* holder for value, and that the note in suit was issued without authority of the defendant and was not its obligation, and points out the distinction between this case and that of *First National Bank of Middletown* v. *This Same Defendant* (56 Hun, 412). It is not claimed that the evidence is insufficient to support the findings of fact made by the referee,

---

and the "tripartite or Hopkins contract" was made part of the record, and its effect upon the parties thereto and the water company brought into consideration. I, therefore, cannot assent to defendant's claim that the decision in this case is concluded by the General Term decision above referred to.

The evidence in the present case shows that the defendant company was organized under the laws of Iowa to supply water in the city of Council Bluffs, in that State, and that this was done by pumping water from the Missouri river to a station in the city and thence conveying it by pipes to consumers. The necessary works were built by a construction company, which then sold them to the defendant company, which issued in payment therefor $500,000 in mortgage bonds upon its property. The moving spirit in the enterprise appears to have been Sidney W. Hopkins, who, in 1885, was the owner of 16,406 shares of the company's stock and $345,000 of the bonds.

Nearly all of the stock and bonds were held by persons who had made loans to Hopkins, and there was a number of outstanding claims against Hopkins, the construction company and the defendant. Hopkins made an agreement with Sewell, Pierce & Sheldon, a firm of lawyers in the city of New York, whereby, in consideration of a sum stated, he transferred to them his equity in the bonds, they agreeing to pay the before-mentioned claims, and he gave them an option to purchase his stock at a certain price on or before September 1, 1886. He further agreed forthwith to transfer to Mr. Sewell, as trustee, 15,606 of the shares of the stock, and that he would secure the resignation of such officers and directors of the Water-works Company as the other parties to the agreement required, and the election in their place of such eligible persons as they should name.

This contract was made by Mr. Sewell and his partners with no idea of carrying it out personally. They were lawyers in large practice and were fully occupied thereby. But it was an apparently profitable scheme to submit to their clients, and if they could get one of them to undertake it — to manage the details which were entirely out of their scope of business and to share the profits, if any there should be, it would be a lucrative enterprise. Mr. Sewell, therefore, laid the matter before one of his clients, Mr. Harry Allen, a banker in this city, and an agreement was made whereby Mr. Allen undertook to do, in whole or in part, what Mr. Sewell and his partners had agreed to do in discharging the before-mentioned claims.

Mr. Hopkins carried out his part of the agreement by transferring to Mr. Sewell, as trustee, the 15,606 shares of stock, and by causing a special meeting of the board of directors of the Water-works Company to be held on May 8, 1885, at which

and upon such evidence we think he has correctly interpreted the decisions and drawn correct legal conclusions.

He finds that during the period from sometime in the month of October, 1885, to February 27, 1887, Harry Allen, as treasurer of the defendant corporation, made and issued in the name of the defendant, and to which the name of the defendant was signed by himself as treasurer thereof, some forty or fifty promissory notes,

---

meeting three of the directors resigned and Messrs. Sheldon, Pierce and Allen were elected in their place.   Mr. Sheldon resigned the treasurership and Mr. Hopkins the presidency, and Mr. Allen and Mr. Sewell were chosen to fill the respective offices.

On June 10, 1885, a stockholders' meeting was held, whereat, by the vote of 16,366 shares of stock, including the 15,606 held by Mr. Sewell, as trustee, a board of seven directors, including Hopkins, Sewell, Pierce, Sheldon and Allen were elected.

The by-laws required a monthly meeting of the directors, but the minutes show that but one meeting was held between May 8, 1885, and February 28, 1887, and that at this meeting no business was transacted, except the re-election of officers, including Sewell and Allen.

At the meeting in February, 1887, Mr. Sheldon was made treasurer in place of Allen.   Mr. Allen, therefore, was the duly appointed treasurer of the defendant, from May 8, 1885, until February 29, 1887.   And during this period he had the entire management of its financial matters.   He was not controlled by any resolutions of the board for they held no meetings.   Mr. Sewell, the president, testified that he "didn't want them,"  He was not supervised or assisted by the president for when he endeavored to consult Mr. Sewell he was told that the latter had his own business to attend to and Mr. Sheldon was named as the person with whom he was to consult.   The office of the company in this city was, at this time, a room forming part of the suite of offices occupied by the law firm Sewell, Pierce and Sheldon.   Mr. Allen, as treasurer, did not use it, but conducted his official business at the office of his firm, Allen & Stead, using the books of that firm for his entries of receipts and payments in behalf of the company  He had to act in a dual capacity — as financial manager of the "pool" under the Hopkins contract and as treasurer of the defendant.   As manager he had to discharge the claims against Hopkins, the construction company and the defendant mentioned in that contract.   As treasurer he had to pay the interest on outstanding bonds and to see that the running expenses of the company were met.   The only means he apparently had for paying the Hopkins or "pool" claims was the sale of bonds and the testimony shows that he did sell a large number.

The running expenses of the company were all incurred at Council Bluffs, but were not equaled by the payments from individual customers there.   In addition the city paid to the water company $20,000 per year in equal semi-annual payments.   These payments were in the form of tax warrants which were forwarded to Allen, who sometimes sold them at ninety to ninety-five per cent, but usually

to the order of, and indorsed "Allen & Stead," which were negotiated, and money obtained thereon ; that the reason for the making of such promissory notes to the order of Allen & Stead was that they were acting as the financial agents of the defendant, and it was to give additional credit to such notes, the credit of the corporation itself being poor; and, although the by-laws of the defendant required the countersigning by the president, none of these notes so

---

borrowed money on them and the proceeds were generally used to pay interest on the bonds.

The company's by-laws provided that the treasurer should sign and indorse all checks, drafts, notes and orders for the payment of money and should pay out the funds of the company under the direction of the board of directors, and that the president should countersign all checks, drafts, notes and other evidences of debt; that the board of directors might "borrow money for the purposes of the company and issue notes and bonds therefor," and that "no debt or liability beyond the necessary legitimate business and current expenses of the company should be contracted by any officer of the company without special authority of the board of directors."

Soon after Allen became treasurer he began to issue notes purporting to be the notes of the company and he continued so to do during his whole term. He issued some forty or fifty notes, all of the form of the note in suit, and the proceeds were used indiscriminately to pay off pool claims and the interest on the mortgage bonds of the Water-works Company and also the current expenses of the company not provided for at Council Bluffs. These notes were issued without the sanction of any resolution of the board and there is no proof that some of the directors ever heard of them.

None of the notes were countersigned by Mr. Sewell, the president of the company, as the by-laws required; Mr. Sheldon, however, not only knew of the proceeding, but actively assisted therein, indorsing several of the notes himself, and in one case in the name of his firm. Among the notes so issued was the one which came into plaintiff's hands at the time and in the manner I have stated.

The elaborate briefs of the counsel for both parties, and my own search for reported decisions, do not disclose any adjudication upon the legal effect of such a state of facts, but the principles underlying the numerous and apparently conflicting decisions concerning debts of corporations, seem to be clear and decisive of this case.

There is no general presumption that unsealed contracts purporting to have been made by the officers of a corporation in its name are corporate obligations, unless authority is implied from the nature of the office, or from previous similar dealings recognized by the corporation, or a ratification has been shown. (*People's Bank* v. *St. Anthony's R. C. Church*, 109 N. Y., 512, 525.)

"Every one knows that corporations are artificial creations existing by virtue of law, and organized for purposes defined in their charters; and he who deals with one of them is chargeable with notice of the purpose for which it was formed;

issued was so countersigned; that the note in suit was, in form, similar to these others; that during all this period, with the exception of one in May, 1886, no meetings of the board of directors were held, and at the one meeting no business was transacted other than the re-election of officers of the defendant; that Allen, though he sought to consult and advise with the president of the corporation, was referred to the latter's law partner, who was also a director in

and when he deals with agents or officers of one of them, he is bound to know their powers and the extent of their authority." (*Alexander* v. *Cauldwell*, 83 N. Y., 485.)

There was nothing in the nature of the business of this company which presumptively gave its treasurer power *virtute officii* to make its notes. (*Craft* v *South Boston R. R. Co.*, 22 N. E. Rep., 920; *Life and F. Ins. Co.* v. *Mechs. Fire Ins. Co.*, 7 Wend., 31; *Mather* v. *Union Loan and Trust Co.*, 7 N. Y. Supp., 214; *Bank of Attica* v. *Pottier & Stymus Mfg. Co.*, 17 N. Y. St. Rep., 328.)

But the authority to make the note in question could be established either by proof of power given to the officer making the note by the by-laws, or by resolution of the board of directors either directing this particular act, or generally authorizing the class of acts (*Elwell* v. *Dodge*, 33 Barb., 339), or in the absence of these by a ratification of the act by the directors, or by proof of their knowledge and assent to similar acts by the same officer sufficiently numerous to have established a "course of dealing," presumably by the corporation, which it would be unfair to repudiate in the special instance.

It is claimed that in the case at bar no such authority was established, and that the evidence fails to bring it even within the scope of *Fifth National Bank* v. *Navassa Phosphate Company* (119 N. Y., 256).

In that case Lawton, who made the note, was not only president and treasurer of the company but also its general manager in the city of New York, where he had sole charge; the company had no cash capital, and for eight or nine years Lawton had managed its business by the issue of notes, and his transactions were entered on the cash-book and check-book. At the annual meetings held in New York, Lawton made a report to the directors, and laid the books before them. They looked them over, not critically, perhaps, but to some extent, and spread upon them was the truth of what Lawton was doing. The court say:

"The real difficulty which beset it, and which produced its defeat in the courts below, was in establishing that the directors knew that he was creating obligations against the company, and gave him authority by acquiescing in its exercise. But the circumstantial evidence, although by no means conclusive, tends to establish that knowledge. The directors knew that the business of the company was being carried on at New York by Lawton; that in the absence of cash capital it must have been done with borrowed money; and, therefore, that Lawton was creating obligations against the company which it would be called upon to reimburse. They knew too that no one of them had given a written consent to him as treasurer to create obligations, and so they must have understood that, to a greater or less

the corporation; that none of the officers or directors used or exercised any official supervision over Allen or his acts and transactions as treasurer, except the director who was the president's law partner, and who, it would appear, was not only consulted with respect to the making of the promissory notes, and the obtaining of money thereon, but concurred in the very beginning with the making of such promissory notes; that further, he not only advised the making

---

extent, he was borrowing money on the credit of the company, either acting as treasurer without the written assent, or acting as president without a specific authority expressly conferred; to either process they assented by silent acquiescence, and, while ignorant of details, it may well be urged that they were not ignorant of the material and fundamental fact."

There is a conflict of evidence as to whether the issue of notes by Allen was known to the directors other than Sheldon. Allen swears that he told Mr. Sewell, and Sewell emphatically denies it.

The plaintiff claims that the proof is conclusive that Allen's conduct as treasurer was known to the officers and a majority of the trustees of the defendant, and that they consented to it; that the by-laws show that the company expected to borrow money and issue notes in order to carry on its business, and that soon after Sheldon succeeded Allen as treasurer he reported to the board April 20, 1887, that "in order to meet the requirements of the company for money and discharge its liabilities, the treasurer has been obliged to borrow the necessary amounts and obligate the company for the payment of the same." Mr. Sewell admitted that Sheldon, whom he had deputized to represent him and the other trustees in relation to the financial management of the company, and who was actively engaged in the issue of the company's notes, consulted constantly with him (Sewell) and Pierce in regard to the company's affairs, and neither Sheldon or Pierce were called as witnesses to contradict Allen's statements that they knew all about the matter.

Plaintiff further claims that it is more than unlikely that Sheldon would have gone so far as to indorse a note in the name of his firm without the knowledge and assent of his partners, and contends that Sewell was, to say the least, mistaken in his testimony that he was ignorant of the matter. I think that the rule, that where evidence would have weight in determining a disputed question of fact is withheld by the party who has control of it, the presumption is that the evidence, if produced, would be beneficial to his adversary, can be fairly applied here, and that the case is, therefore, brought within the scope of the decision in *Fifth National Bank* v. *The Navassa Phosphate Company*. The defendant claims, however, that if the directors received notice of the issue of the notes the information did not charge the corporation, because it was not communicated to and received by them in the course of the business of the corporation.

If this contention means that notice to members of a board when not in session is not information coming to them as officers of the company, I know of no authority to support it. A director or officer may be fully engaged in the business of the company when not present at a meeting of the board.

and issuing of such notes from time to time, but personally indorsed a large number of them, and one with the name of his firm, of which the president was a member.

A review of the evidence supporting these findings will sustain the referee and justify his conclusion that Allen was practically the corporation, and that the case is brought within the principle laid down in *Fifth National Bank* v. *Navassa Phospate Company*

---

We have seen that the directors of this company held no meetings whatever during the years 1885 and 1886, but Mr. Sewell, when asked whether the directors of the company performed any services during those years, replied that he performed services and so did Mr. Hopkins, Mr. Sheldon and Mr. Pierce; and being asked what duties they performed, he replied that they consulted with him on the affairs of the company, advised and talked over matters.

It is evident, therefore, that the mode in which the directors of this company chose to perform their duties as such, was not by holding formal board meetings, but by meeting together and consulting with the president, and if notice came to them while so engaged it must have been received while they were acting for the company.

The defendant also claims that the individual action of the directors, in assenting to the issue of the notes, was not binding upon the corporation, upon the authority of *Peoples' Bank* v. *St. Anthony's Roman Catholic Church* (109 N. Y., 512).

It is true that in that case the court said : "Trustees of a corporation have no separate or individual authority to bind the corporations, and this, although the majority or the whole number acting singly and not collectively as a board should assent to the particular transaction," but although this may be true concerning a religious corporation, whereof the statute creating it prescribed that the only method in which it could act at all was by the act of "a majority of the trustees *being lawfully convened.*" I do not understand that the doctrine applies to business corporations having more general powers.

But I think the plaintiff's cause does not depend upon a preponderance of proof as to whether the directors knew of the issues of the notes, and if so, whether they knew of it as individuals or as officials. It can rest upon a broader ground, namely, that Allen, during his whole term of office, was not only the treasurer *but the company itself.* The directors had voluntarily resigned to him the whole management of affairs, and this demanded the raising of money. The board never met to supervise his conduct, to learn the condition of the company, and to give him such authority as the by-laws directed and the emergency required in order to raise this money. The by-laws demanded that notes should be countersigned by the president, but the president refused to talk with Allen and appointed a representative for that purpose — the former treasurer of the company — who, instead of stopping Allen's unauthorized proceeding, became an active partner in it. The defendant's counsel, in his able argument, claimed that this was the result of the Hopkin's agreement; that Allen issued these notes in order to finance the obligations therein set forth, but that in so doing he was acting as the representative of

(119 N. Y., 256), because he was not only the treasurer of the defendant, but, as said in that case, " he was consciously invested by the company with the broad general power inseparable from the position in which it placed him as the sole manager of its affairs at its principal place of business." Acting, therefore, within the apparent scope of the authority conferred upon him by the corporation, the latter is charged with liability, irrespective of the question of

---

the parties thereto and not as the treasurer or manager of the defendant; that there was no necessity to borrow money for the defendant and that his actions in so doing without authority of the board were not binding upon the company.

The answer to this is twofold. Among the obligations assumed by the Hopkins agreement were some of the company itself, and both Sewell and Allen testified that certain of the company's creditors were urgent. To save the company, money had to be raised by some means. If Allen, as an individual, had engaged to do this, either wholly or in part, and, as an individual, had failed to carry out his contract, while this might give Hopkins or the company a claim against him for damages, it could not remove the company's present necessities nor the emergency which called upon the treasurer to raise money for the company's needs. And Allen's testimony shows that there was need of money to meet the current expenses of the company.

But another answer is this: The Hopkins contract was, by its terms, a secret agreement. No one was to know that the man, who had created the company built the water-works and owned the far greater part of the stock and bonds, was to sell out the enterprise to a legal firm in this city. No one was to know that upon his command the directors in the company were to resign their offices unconditionally in order that such persons as this firm might name should fill their places, and no one, except the parties concerned, did know that these new directors and officers did not fulfill any of their duties, except to meet in the president's private office and talk over its affairs, while its actual business was wholly left in the hands of its treasurer.

On the other hand, the public did know that for more than a year before the issue of the note in suit similar notes had been issued apparently by this company, sometimes with the indorsement of the banking firm who had been declared·in the pamphlet published under the direction of its president to be the company's bankers; that these notes, as they matured, were promptly met so that the company's credit was good; that the interest of its bonds was paid; that the bonds themselves were sold in large quantities, and that all this was done by one man, the treasurer of the company.

Can it be said that as to third parties a course of dealing was not established which would justify the belief that the issue of these notes was valid?

It was within the defendant's power as a business corporation to issue notes; this could be done only through its officers, and the treasurer was apparently the proper officer to act in the matter. (*Beers* v. *Phœnix Glass Co.*, 14 Barb., 358;

authority in fact. It would serve no useful purpose to traverse the grounds so carefully gone over by the learned referee, it being sufficient upon this branch of the case to say that we concur in his reasoning, and in the conclusion reached.

The question, however, as to the extent of the defendant's liability, remains to be considered. This note in suit, as shown, was delivered as collateral security to a loan of $4,500 made by plaintiff to one

*Bank of Utica* v. *Pottier* & *Stymus Mfg. Co.*, 17 N. Y. St. Rep., 327; *Fay* v. *Noble*) 12 Cush., 1.) But Mr. Allen was more than a mere treasurer. He was announced to the world as the company's banker, and was suffered to have full control of its financial affairs, and his conduct as such, within the scope of the business, binds the company, whether or not the directors knew of it at the time or ratified it afterwards. (*Kraft* v. *Freeman Printing, etc., Association*, 87 N. Y., 628; *Fifth Nat. Bank* v. *Navassa Phosphate Co.*, *supra*; *Caldwell* v. *Nat. Mohawk Valley Bank*, 64 Barb., 342; *National Park Bank* v. *German Am. M. W. and S. Co.*, 53 Supr., 367.,

In a case befor the Court of Errors and Appeals of New Jersey, in 1886, the court held:

"There are cases in which the powers of an officer of a corporation and his authority to act for the company, are enlarged beyond those powers which are inherent in his office. But those are cases in which the agency of the officer has arisen from the assent of the directors, presumed from their consent and acquiescence in permitting the officer to assume the direction and control of the business of the company. Thus, when, in the usual course of the business of a corporation, an officer has been allowed in his official capacity to manage its affairs, his authority to represent the corporation may be implied from the manner in which he has been permitted by the directors to transact its business. These are simply instances of the application of the principle that usual employment is evidence of the powers of an agent, and a responsibility will be laid upon the principal for the acts of his agent, within the apparent authority so conferred upon the agent, a doctrine which has come to be applied to corporations in many respects as well as to individuals, and with the same qualifications and limitations. In such cases the authority of the officer does not depend so much on his title, or on the theoretical nature of his office, as on the duties he is in the habit of performing." (*Stokes* v. *N. J. Pottery Co.*, 46 N. J. Law, 242; *Martin* v. *Webb*, 110 U. S., 7; *Com. Mut. Marine Ins. Co.* v. *Union Mut. Ins. Co.*, 19 How. [U. S.], 318; *Mining Co.* v. *Anglo-Cal. Bank*, 104 U. S., 192; Taylor on Corporations, §§ 202, 236, 244; Angell & Ames on Corporations, §§ 229, 302.)

"The trial judge charged the jury that neither the charter nor the by-laws gave Boice, as treasurer, express power to borrow money and give the company's notes and make a pledge of its securities for the payment thereof, nor was such power invested in him as treasurer *virtute officii*, but that if Boice was held out by the managers of the company in general course of dealings as agent of the company with such authority, his acts as to such agent were binding on the company, and that question the judge submitted as a question of fact for the determination of the jury."

Bradford, under an agreement that the loan was to be, paid in a few days with interest at the rate of five dollars a day until such time as the loan was paid.   If the recovery upon this note were to include the $4,500 and interest as agreed upon, then it would amount to more than the principal and interest upon the note itself.

But the appellant insists that neither of these, measure the extent, if answerable at all, of defendant's liability, but that all that plaintiff

---

And the court held that this instruction to the jury was proper.

In the case of *New York and New Haven Railroad Company* v. *Schuyler* (34 N. Y., 58), the court say:

"It is transparent throughout the case, that the board of directors, by passive submission or active surrender, handed over to Schuyler the substance of all their authority relating to their business in New York, and then for nearly seven years laid down to sleep in supine indifference at his feet.   Aroused by the shock of the calamity which their folly has induced, are they now to look calmly over the wreck with no answer to its innocent victims but that of Macbeth to the ghost of Banquo?

If the managers faithfully perform their duty,' said STRONG, J., in *Beers* v. *Phœnix Glass Company* (14 Barb., 360), 'they exercise a constant and vigilant supervision over the acts of their officers, and where such acts are unauthorized, or in opposition to their will, they should, and probably do direct their discontinuance, and in case of willful and palpable violation of duty, dismiss the agent.   If the directors of a company, no matter whether through inattention or otherwise, suffer its subordinate officers to pursue a particular line of conduct for a considerable period without objection, they are as bound to those who are not aware of any want of authority as if the requisite power had been directly conferred.'"

The fact that the notes were not in the form required by the by-laws, and were issued without a previous direction of the board of directors, did not necessarily make them invalid.   In a late case (*Rathburn* v. *Snow*, 123 N. Y., 343), the Court of Appeals held:

"Third persons may act upon the apparent authority conferred by the principal upon the agent, and are not bound by secret limitations or instructions qualifying the terms of the written or verbal appointment, that the defense based upon the limitation in the by-laws of the company, of which the plaintiff had no knowledge, cannot be sustained.   By-laws of business corporations are, as to third persons, private regulations binding as between the corporation and its members or third persons having knowledge of them, but of no force as limitations *per se* as to third persons, of an authority which, except for the by-laws, would be construed as within the apparent scope of the agency.   (*Fay* v. *Noble*, 12 Cush., 1; *Bank* v. *Smith*, 19 Johns., 115; *Smith* v. *Smith*, 62 Ill., 493; 2 Mor. on Cor., § 593, and cases cited.)"   (See, also, *Martin* v. *Niagara Falls Paper Co.*, 44 Hun, 130; *Walker* v. *Wilmington C and A. R. Co.*, 1 So. E. Rep., 366.)

The plaintiff is not affected by the limitation of defendant's power to contract debts under its by-laws or the laws of Iowa.   (*Bissell* v. *Mich. So. R. R. Co.*, 22 N. Y., 259; *Curtis* v. *Leavitt*, 17 Barb., 312; *Steam Nav. Co.* v. *Weed*, Id., 378.)

And upon the whole case I am of the opinion that the plaintiff is entitled to judgment.

can claim is the $4,500 advanced on the faith of defendant's note, with interest thereon from the date of the loan, at the rate of six per cent. In *Todd* v. *Shelbourne* (8 Hun, 512) it was held "that the indorsee of commercial paper, not valid as a legal obligation in the hands of the payee negotiating it, must be restricted in his recovery to the value with interest advanced by him to the payee upon the faith of it." This and other cases are authority for the proposition that where a negotiable instrument is not enforceable between the parties a *bona fide* holder can only recover what he or some prior holder through whom he derived his title paid for it, with interest. (Randolph on Commercial Paper, § 994.) Taking the facts here, we think that this note was not valid as a legal obligation in the hands of the payee negotiating it or in the hands of Bradford who delivered it to the plaintiff as collateral security for a loan made by him, but that when transferred to the plaintiff it became, in his hands, a legal obligation against the defendant, but only to the extent of what was advanced upon the faith thereof. We think the principle of the cases, which, under such circumstances would prevent a profit being made out of the transaction, is applicable, and that, while the plaintiff is entitled to protection to the extent of the moneys he advanced and legal interest from the date of the loan, he cannot recover either the face value of the note, with interest thereon, nor the amount loaned, with interest at the rate agreed upon by Bradford of five dollars a day. The difference, however, in the amount is easily computed, and, when ascertained, should be deducted from the judgment, and the judgment, as so modified, should be affirmed, without costs.

VAN BRUNT, P. J., and FOLLETT, J., concurred.

Judgment modified as directed in opinion, and, as modified, affirmed, without costs.